## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDEL DISTRICT OF PENNSYLVANIA

CURTIS LOVING,                                        :
                                                      :
              Plaintiff,                              : CIVIL ACTION NO. 3:18-CV-508
                                                      : (JUDGE MARIANI)
       v.                                             :
                                                      :
FEDEX FREIGHT, INC.,                                  :
                                                      :
              Defendant.                              :

## MEMORANDUM OPINION
### I.  INTRODUCTION

Defendant's Motion for Summary Judgment (Doc. 40) is pending before

the Court.  In the underlying action, Plaintiff alleges that Defendant violated Title VII of the

Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"),

and the Pennsylvania Human Relations Act ("PHRA") when Defendant terminated him in

June 2017 allegedly for using the "n word" in the workplace.  (Doc. 18.)  Plaintiff's Title VII

violations are based on race discrimination and retaliation.  (*Id.* at 5, 8.)  His PHRA

violations are based on race and age discrimination.  (*Id.* at 6, 18.)   Defendant seeks

summary judgment on all claims, stating there is no genuine dispute as to any material fact

and it is entitled to judgment as a matter of law.  (Doc. 40 at 1.)  For the reasons that follow,

the Court will grant Defendant's Motion for Summary Judgment (Doc. 40) in part and deny it

in part.

## II. STATEMENT OF UNDISPUTED FACTS[1]

Plaintiff Curtis Loving ("Loving" "Plaintiff") is an African-American male who began working for Defendant FEDEX Freight, Inc., ("FXF" "Defendant") in September 2016 as a driver's apprentice at Defendant's service center in Pocono Summit, Pennsylvania ("POS"). (Doc. 18 ¶ 1; Doc. 42 ¶ 1; Doc. 46 ¶ 1.)   As a driver apprentice, Loving's employment was contingent upon successfully completing the requirements necessary to become a driver. (*Id.*)   Loving was unable to satisfactorily complete the requirements to become a city driver. (Doc. 42 ¶ 2; Doc. 46 ¶ 2.)  Instead of ending his employment, FXF offered him a position as a part-time dockworker. (*Id.*)

Loving transferred to the dockworker position on or around February 1, 2014.  (*Id.*) In March of 2014, he requested FXF transfer him to the position of a fulltime dockworker, a

---

[1] Normally the Court considers only the moving party's statement of undisputed facts and the non-moving party's responses thereto.  M.D. Pa. L.R. 56.1.  Separate statements of fact not directly responsive to the movant's statement of fact are not contemplated by L.R. 56.1 and need not be given any evidentiary value. *Rau v. Allstate*, Civ. A. No. 3:16-CV-359, 2018 WL 6422121, at *2 (M.D. Pa. Dec. 6, 2018), *aff'd*, 793 F. App'x 84 (3d Cir. 2019).  However, a court may exercise its discretion when presented with a separate counterstatement of facts.  793 F. App'x at 87.  Here, the Court will consider Plaintiff's Supplemental Statement of Facts (Doc. 45-2), but only because Defendant has responded to them in corresponding numbered paragraphs (Doc. 52). Thus, in addition to undisputed factual averments contained in the Amended Complaint (Doc. 18), the recited facts are derived from Defendant's Statement of Material Facts (Doc. 42), Plaintiff's Response to Defendant's Statement of Facts (Doc. 46), Plaintiff's Supplemental Statement of Facts (Doc. 45-2), and Defendant's Response to Plaintiff's Supplemental Statement of Facts (Doc. 52).

The parties provide citation to the record in support of their factual assertions.  The Court has verified citations but omits them from the recitation set out in the text. In some instances, the parties partially admit and/or qualify their responses.  (*See* Docs. 46, 52.)  In the Statement of Undisputed Facts, the Court includes only those facts which are agreed upon.

position which would offer "company advancement" and better pay.  (Doc. 42 ¶ 4; Doc. 46 ¶ 4.)  The request was made to Jeff Ulkoski ("Ulkoski"), an operations manager whom Loving knew.  (*Id.*)  Ulkoski, along with Dale Symons ("Symons"), the assistant service center manager at the time, approved the promotion.  (*Id.*)  Both Ulkoski and Symons were aware that Loving was African American.  (*Id.*)

In May of 2015, FXF promoted Loving to operations supervisor.  (Doc. 42 ¶ 5; Doc. 46 ¶ 5.)  His new position was a promotion from an hourly worker to a salaried, supervisory position.  (*Id.*)  An operations supervisor's primary responsibility was to "[l]ead employees to ensure customer satisfaction by moving all shipments on time and damage free."  (*Id.*)  On any given shift, Loving could have supervised sixty dockworkers.  (*Id.*)  In his deposition, Loving described his role as an operations supervisor as "to lead [dockworkers], to supervise them, to be that guy to look up to on the dock."  (*Id.*)  He also said that dockworkers looked to operations supervisors for "guidance" on "conduct" and how to "carry themselves."  (*Id.*)  When Loving was promoted to operations supervisor, he underwent additional training on "company expectations" and "policies."  (Doc. 42 ¶ 6; Doc. 46 ¶ 6.)

FXF maintains an employee handbook ("Handbook") which an employee is able to access through an online link referred to as "Knowledge Base."  (Doc. 42 ¶ 7; Doc. 46 ¶ 7.)  FXF instructed Loving how to access this Handbook, and he had access to the Handbook online during his employment with FXF.  (*Id.*)  As a part of this Handbook, FXF maintains a policy against discrimination and/or harassment based on age and race, as well as other

3

protected traits.  (Doc. 42 ¶ 8; Doc. 46 ¶ 8.)  Harassment is defined in relevant part as the "[u]se of disparaging or defamatory slurs" based on a protected category.  (*Id.*)  Also, as a part of the Handbook, FXF maintains a "Code of Conduct" policy that that prohibits "profane, obscene, harassing, sexually explicit, discriminatory or abusive language."  (Doc. 42 ¶ 9; Doc. 46 ¶ 9.)

FXF operates under a progressive discipline policy when employees, supervisors, or managers fail to meet expectations.  (Doc. 42 ¶ 10; Doc. 46 ¶ 10.)  The terms of progressive discipline differ between salaried and hourly employees.  (*Id.*)  For salaried employees, the first written disciplinary action is referred to as an "improvement plan" or improvement letter."  (*Id.*)  If the salaried employee fails to demonstrate improvement in the area addressed by the improvement plan, FXF may issue a "critical letter of commitment," the next stage of progressive discipline.  (*Id.*)  If the deficiencies persist, the employee may be terminated.  (*Id.*)  An employee may receive multiple improvement letters before moving on to a "critical letter of commitment."  (*Id.*)   Supervisors or managers may issue improvement plans or improvement letters.  (*Id.*)  Any discipline beyond an improvement letter (a critical letter of commitment or termination) requires the approval of human resources.  (*Id.*)  Depending on the severity, management may forego progressive discipline and proceed directly to termination.  (Doc. 42 ¶ 11; Doc. 46 ¶ 11.)

Ulkoski, who supervised Plaintiff in Plaintiff's role as operations supervisor (Doc. 45-2 ¶ 1; Doc. 52 ¶ 1), stated in his deposition that grounds for immediate termination include:

4

"violence, any threats, intimidation or harassment, racism, anything that would violate equal opportunity employment." (Doc. 42 ¶ 11; Doc. 46 ¶ 11.) Ulkoski further stated that cursing would not justify immediate termination. (*Id.*)

The Handbook contains a process where an employee may appeal a termination. (Doc. 42 ¶ 12; Doc. 46 ¶ 12.) The appeal is presented to a panel of three voting members who were not involved in the termination decision and at least one director from outside the employee's region. (*Id.*) At this appeal, the employee has the option to present his or her case to the panel. (*Id.*) After hearing from the terminated employee and the terminated manager, the panel renders a decision to uphold or overturn the termination. (*Id.*) FXF will determine the appropriate back pay for a reinstated employee. (*Id.*)

Nathan Pulaski ("Pulaski"), an operations manager at POS who supervised Loving, testified at his deposition that, on June 20, 2016, he learned of a potential incident earlier in the day between Loving and David Gallagher ("Gallagher"). (Doc. 42 ¶ 13; Doc. 46 ¶ 13.) Pulaski said that he believed one of the operations supervisors reported the incident to him in the late afternoon, and Pulaski understood that "some form of an altercation had occurred" and Gallagher was upset. (*Id.*) Pulaski spoke to and got written statements from, Gallagher, Loving and Thomas Naselli, an operations supervisor. (Doc. 42 ¶ 14; Doc. 46 ¶ 14.) Gallagher stated that Loving and he got into a verbal altercation when Gallagher went to retrieve some boards from Loving's area. (*Id.*) According to Gallagher's statement, Loving exclaimed "Look at my nigga getting all red." (*Id.*) Naselli stated that he sent

Gallagher to get boards, which led to a disagreement between Loving and Gallagher.  (Doc. 42 ¶ 15; Doc. 46 ¶ 15.)  According to Loving in his deposition, Pulaski informed him that he had been accused of calling Gallagher the "N-word" on the dock that day.  (Doc. 42 ¶ 16; Doc. 46 ¶ 16.)  In his statement, Loving denied that he used a racial slur during the altercation but stated that "we have joked around in the past using words like nigger please, Black boy and white boy sunflower seeds [and] brother from another mother." (*Id.*)  In his deposition, Pulaski testified that he interpreted the language in the statement to mean that Gallagher also used the "n word" at times when interacting with Loving.  (Doc. 45-2 ¶ 13; Doc. 52 ¶ 13.)  Pulaski also stated that it "would have mattered, absolutely" if Gallagher joked back and used the same kind of language as Loving used.  (Doc. 45-2 ¶ 14; Doc. 52 ¶ 14.)

On June 21, 2019, Pulaski sent the following email to Joe Cerda ("Cerda"), Employee Relations Specialist ("ERS") for POS, and copied Symons and Ulkoski:

Subject: Loving/Gallagher incident

Joe,

Attached are the statements from Naselli, Gallagher, and Loving. In talking to Curtis [Loving] as he wrote his statement, he claims he doesn't remember using any form of racial slur during the altercation. But shortly after, he admitted to me that he has used the terms "nigger", "nigga", "white boy", "white boy seeds/black boy seeds"([alluding] to sunflower seed(s), etc.[)]. [i]n the past with Dave. He also included that in his statement as well. Take what I say with a grain of salt but I think we can all agree that this is a direct violation of so many aspects of the employee expectations/guidelines, the expectations set [forth] for our leadership and the principles that this company is built upon

and it should be treated as such and nothing less…as always, let me know what you think and ask any questions that you have.

(Doc. 42 ¶ 17 (alterations in Defendant's text); Doc. 46 ¶ 17.)

Loving testified in his deposition that he informed Cerda that Gallagher used phrases like "my nigga" with him, but he was not offended by it.  (Doc. 42 ¶ 19; Doc. 46 ¶ 19.)   At his deposition Cerda said that Loving never told him that Gallagher had used the "n-word" in the past with him.  (*Id.*)  There is no reference to Loving accusing Gallagher of using the "n-word" in Cerda's notes.  (*Id.*)  Cerda noted in his investigation that Loving told him that he and Gallagher joked around on the dock and talked about "black boy and white boy" sunflower seeds.  (Doc. 45-2 ¶ 15; Doc. 52 ¶ 15.)  In his deposition, Cerda said that comments about "black and white boy" sunflower seeds violated the code of conduct and were not appropriate.  (Doc. 45-2 ¶ 17; Doc. 52 ¶ 17.)

Cerda interviewed James Mickens who stated that he witnessed the incident but did not overhear anything specific that was said.  (Doc. 42 ¶ 21; Doc. 46 ¶ 21.)  Cerda interviewed Thomas Naselli who stated that he had heard Loving and his friends "use the word jokingly," but "would be surprised if [Loving] would have used that phrase with [Gallagher]."  (Doc. 42 ¶ 22; Doc. 46 ¶ 22.)

As stated in his Corrective Action Recap ("Recap"), Cerda ultimately recommended Loving's termination.  (Doc. 42 ¶ 23; Doc. 46 ¶ 23.)  Specifically, Cerda found that Loving's acts violated FXF's code of conduct that forbade "discriminatory language."  (*Id.*)  Cerda recommended termination because "Mr. Loving has used discriminatory language on the

dock, which is prohibited by FedEx Freight Conduct of Employees Policy.  Mr. Loving is a

member of leadership and should lead by example, using the kind of language he did on the

dock is unacceptable."  (*Id.*)  Cerda also referenced the "Equal Employment

Opportunity/Non-Discrimination Policy" under the relevant standards of conduct at issue in

the decision to terminate Loving.  (*Id.*)

On June 27, 2018, Cerda sent his supervisor, Brian Jenkins ("Jenkins") the following

email with Recap attached.

Subject: Curtis Loving POS Supervisor

Brian,

Please review the attached corrective action recap for POS supervisor Curtis
Loving. On 06/20/2017 Mr. Loving was involved in an incident in which he is
accused of using racial comments, (sic) this was not confirmed for this specific
incident but (sic) Mr. Loving did admit he has used racial remarks in the past
with hourly associates. I am recommending termination of employment be
administered.

(Doc. 42 ¶ 24 ("(sic)" in Defendant's text); Doc. 46 ¶ 24.)  Jenkins replied to Cerda in

support of his recommendation. (Doc. 42 ¶ 25; Doc. 46 ¶ 25.)  Ulkoski, with Pulaski and

Cerda present, informed Loving of his termination on June 28, 2017.  (*Id.*)

According to Cerda, prior to and during the Loving investigation, he never received

any other complaints of a supervisor or any other employee using the word nigger or

racially-charged language that approaches the historically negative magnitude of that word.

(Doc. 42 ¶ 27; Doc. 46 ¶ 27.)  Gallagher never complained to Ulkoski, Pulaski, or anyone at

FXF about Loving using racial slurs, including the "n word," in the past.  (Doc. 45-2 ¶ 21;

Doc. 52 ¶ 21.)

Gallagher received no formal discipline for his role in the incident involving Loving.

(Doc. 45-2 ¶ 19; Doc. 52 ¶ 19.)  Ulkoski thought Gallagher deserved discipline for improper

language and losing his temper in the workplace.  (Doc. 45-2 ¶ 20; Doc. 52 ¶ 20.)

Loving did not appeal his termination through the internal appeals process. (Doc. 42

¶ 28; Doc. 46 ¶ 28.)  He filed a charge with the Pennsylvania Human Relations Commission

("PHRC") on September 17, 2017.  (Doc. 42 ¶ 29; Doc. 46 ¶ 29.)  His Charge lists his date

of birth as December 12, 1966.  (*Id.*)

Loving suffered from elbow and ankle injuries while employed at FXF.  (Doc. 45-2 ¶

40; Doc. 52 ¶ 40.)  At some point between October and December 2017, Loving applied for

disability benefits.  (Doc. 42 ¶ 30; Doc. 46 ¶ 30.)  Since December of 2017, Loving has been

unable to work because of medical issues with his back, arm, and ankle.  (*Id.*)  According to

Loving, he has been unable to work because his "body started shutting down." (*Id.*)  He

stated in his application for disability that he was unable to work because of issues with his

back, ankle, knee and shoulder.  (*Id.*)  He was found to be disabled and began receiving

benefits in October 2018.  (*Id.*)  He is paid disability benefits because "it would be somewhat

impossible for me to continue---to keep a job without being out and without being fired

because of me having to be out." (*Id.*)

At his deposition, Ulkoski described Loving as a good worker who was dependable and well-liked.  (Doc. 45-2 ¶ 2; Doc. 52 ¶ 2.)  He said that Loving worked in a productive manner, accomplished his tasks, and got along well with his co-workers.  (Doc. 45-2 ¶ 3; Doc. 52 ¶ 3.)  He also noted that Loving interacted positively with his managers and supervisors and showed respect to others in the workplace.  (Doc. 45-2 ¶ 4; Doc. 52 ¶ 4.)

Pulaski also supervised Loving and reported to Ulkoski.  (Doc. 45-2 ¶¶ 6, 7; Doc. 52 ¶¶ 6, 7.)  At his deposition, Pulaski said that he found Loving to be a strong, dependable employee who got along with others and acted in a respectful and professional manner. (Doc. 45-2 ¶ 8; Doc. 52 ¶ 8.)

In the Complaint, Loving alleges that Marcus Sandone ("Sandone"), a white male, received more favorable treatment.  (Doc. 42 ¶ 31; Doc. 46 ¶ 31.)  Like Loving, Sandone was an operations supervisor who was supervised by Pulaski.  (Doc. 45-2 ¶¶ 22, 23; Doc. 52 ¶¶ 22, 23.)  In his deposition, Loving references an altercation between Sandone and Marc Bragg-Best ("Bragg-Best") (African American), a dockworker. (Doc. 42 ¶ 32; Doc. 46 ¶ 32.)  Loving was not present during this altercation and does not have a first-hand account of what occurred.  (*Id.*)  According to the Corrective Action Recap ("Recap-Sandone/Bragg-Best"), the incident referred to by Loving occurred on June 12, 2015, and was investigated by ERS Dmitry Shvartsband ("Shvartsband").  (*Id.*)  The Recap-Sandone/Bragg-Best stated that Sandone "cursed and yelled" at Bragg-Best.  (*Id.*) Specifically, Sandone asked Bragg-Best if he "was going to pick up that fucking bill?"  (*Id.*)

10

Symons, the same assistant service center manager who received notice of Loving's incident (Doc. 45-2 ¶ 27; Doc. 52 ¶ 27), received the complaint and took statements from Sandone, Best-Bragg and two other employees. (Doc. 42 ¶ 34; Doc. 46 ¶ 34.)  Bragg-Best stated that Sandone "started cursing." (*Id.*)  None of the statements contain any allegations regarding racially-charged language. (*Id.*)  The Recap-Sandone/Bragg-Best provides no indication that racially-charged language was used by Sandone. (*Id.*)  Shvartsband recommended, and Sandone ultimately received, a critical written warning for violating his responsibility to "lead by example" and refrain from "foul or abusive language." (*Id.*)  Pulaski believed that Sandone should have been terminated based on the incident with Bragg-Best. (Doc. 45-2 ¶ 30; Doc. 52 ¶ 30.)  The incident with Bragg-Best was not Sandone's first offense—he had prior corrective actions. (Doc. 45-2 ¶ 32; Doc. 52 ¶ 32.)

In 2018, Cerda investigated another incident where Sandone used "profane" language to an hourly employee. (Doc. 42 ¶ 36; Doc. 46 ¶ 36.)  Pursuant to his investigation, Cerda confirmed that Sandone had used the word "fucking" several times toward an hourly employee. (Id.)  Based on this abusive language, Sandone was terminated. (*Id.*)  Sandone was 51 years old at the time of his termination. (*Id.*)

Loving also alleges in his Complaint that FXF treated Jeremy Fox ("Fox") differently. (Doc. 42 ¶ 37; Doc. 46 ¶ 37.)[2]  Fox, a white male in his late 20s/early 30s, worked in the

---

[2] Defendant incorrectly numbers this paragraph and the following paragraph as paragraphs 37 and 37. (*See* Doc. 42 at 13.)  The Court uses the correct sequential numbers.

same position as Loving, i.e., he was an operations supervisor.  (Doc. 45-2 ¶¶ 34, 35; Doc.

52 ¶ 34, 35.)  In his deposition, Loving states that Fox had been in a disagreement using

"profanity," but had not used the "n-word" or other racially-charged language.  (Doc. 42 ¶ 38;

Doc. 46 ¶ 38.)  Pulaski notified Cerda of the incident. (Doc. 45-2 ¶ 37; Doc. 52 ¶ 37.)

According to Cerda in his deposition, Fox and Osman Sirleaf (African American), a

dockworker, had been in an argument where there was cursing.  (*Id.*)  Cerda does not

remember who was accused of cursing.  (*Id.*)  The altercation violated company policy and

breached standards of conduct.  (Doc. 45-2 ¶ 38; Doc. 52 ¶ 38.)  Neither employee was

disciplined.  (Doc. 42 ¶ 38; Doc. 46 ¶ 38.)  Cerda testified in his deposition that Fox should

have been disciplined bud FXF failed to properly investigate the incident.  (Doc. 45-2 ¶ 39;

Doc. 52 ¶ 39.)

## III.  STANDARD OF REVIEW

Summary judgment is appropriate "only where there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law."  *Gonzalez v. AMR*, 549

F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary

basis on which a reasonable jury could find for the non-moving party, and a factual dispute

is material only if it might affect the outcome of the suit under the governing law."  *Kaucher*

*v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of

those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV.  ANALYSIS

### A.  Race Discrimination Claims

Defendant asserts that Plaintiff does not have a viable race discrimination claim because "the undisputed facts do not allow a reasonable factfinder to conclude that circumstances surrounding Plaintiff's termination indicate FXF intentionally discriminated against Loving." (Doc. 41 at 11.) Defendant specifically asserts that Plaintiff is unable to

show that similarly situated, non-African American employees were treated more favorably or that the decision to terminate him was a pretext for racial discrimination.  (*Id.* at 11, 18.) Plaintiff responds that disputed issues of material fact prevent the grant of summary judgment on Plaintiff's race discrimination claim in that he has come forward with evidence that FXF failed to terminate white male employees who held the same position as he for similar infractions and he has presented sufficient evidence to demonstrate that Defendant's asserted reason for termination was pretextual.  (Doc. 45 at 11, 18.)  For the reasons that follow, the Court concludes that Defendant has failed to satisfy its burden of showing that there are no genuine issues of material fact and it is entitled to judgment as a matter of law on Plaintiff's race discrimination claims.

Title VII and the PHRA both prohibit discrimination by an employer against an individual based on that individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e–2(a); 43 Pa. Cons. Stat. Ann. § 955(a).  PHRA claims "are generally interpreted coextensively with Title VII claims."  *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 213 (3d Cir. 2015) (internal quotations and citations omitted).  Because the same legal standards apply to Title VII and Pennsylvania Human Relations Act claims, the Court will refer only to Title VII for the remainder of the race discrimination analysis.

A plaintiff can prove discrimination on a direct basis, which requires direct evidence of discriminatory animus. *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997); *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010).  Alternatively,

a plaintiff can prove discrimination on an indirect basis by satisfying the familiar three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

Under the *McDonnell Douglas* framework applicable here, the plaintiff bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). When a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant "to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (quoting *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)). "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

Once the defendant offers a legitimate non-discriminatory reason, "the burden of production [shifts] back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426 (*citing Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)). To survive summary judgment, "the plaintiff must point to some evidence ...

16

from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

### 1. Prima Facie Case of Race Discrimination

Defendant asserts that Plaintiff fails to raise an inference of discrimination because the proposed comparators are not similarly situated and "based on the substantial and fundamental differences" between Plaintiff and his proposed comparators, the Court should find that Plaintiff has failed to state a cause of action for racial discrimination.  (Doc. 41 at 13, 17.)   In his Amended Complaint, Plaintiff identifies two white males, Marcus Sandone and Jamie Fox, who held the same position and were not terminated after they got into serious altercations with dockworkers which included cursing.  (Doc. 18 ¶¶ 37-40.)   He also points to the dockworker with whom he had reportedly had an altercation, David Gallagher, whom Plaintiff alleges used discriminatory language prior to the incident and was not disciplined.  (*Id.* ¶¶ 35-36.)  Defendant contends that Plaintiff cannot raise an inference of discrimination based on the evidence proffered because these individuals are not similarly situated to Plaintiff.  (Doc. 41 at 11-17.)  Plaintiff responds that a reasonable jury could find that similarly situated individuals received more favorable treatment than he in that FXF failed to terminate Sandone and Fox for similar infractions.  (Doc. 45 at 11.)

In its supporting brief, Defendant's initial argument regarding similarly situated individuals does not explicitly focus on the *prima facie* stage of the *McDonnell Douglas* inquiry. (See Doc. 41 at 11-17.) However, the argument presented and conclusions drawn focus on Plaintiff's burden to raise an inference of discrimination (*see id.* at 11, 13, 16) which is the showing required with the fourth element of the *prima facie* case, *see infra* p. 19. Therefore, the Court will first focus on whether Plaintiff has satisfied his burden of raising an inference of unlawful discrimination at the *prima facie* stage of the *McDonnell Douglas* inquiry.

The Supreme Court discussed the *prima facie* stage of the *McDonnell Douglas* inquiry in Title VII cases in *Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015). The Court explained that

> it is "not intended to be an inflexible rule." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 575, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Rather, an individual plaintiff may establish a *prima facie* case by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under" Title VII. *Id.* at 576, 98 S.Ct. 2943 (internal quotations omitted). The burden of making this showing is not onerous. [*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)]. . . . In particular, making this showing is not as burdensome as succeeding on "an ultimate finding of fact as to" a discriminatory employment action. *Furnco, supra,* at 576, 98 S.Ct. 2943.

*Young*, 575 U.S. at 228–29.

The Court of Appeals for the Third Circuit explained in *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789 (3d Cir. 2003), that "[t]he existence of a *prima facie* case of employment

discrimination is a question of law that must be decided by the Court." *Id.   Sarullo* added

that "the *prima facie* test remains flexible and must be tailored to fit the specific context in

which it is applied.  *Id.* at 797-98 (quoting *Geraci v. Moody–Tottrup, Int'l, Inc.,* 82 F.3d 578,

581 (3d Cir.1996)).  The following four elements are generally found to comprise the

showing needed to establish a *prima facie* case of race discrimination:  a plaintiff "must

show that '(1) he is a member of a protected class, (2) he is qualified for his position, (3) he

suffered an adverse employment action, and (4) the adverse employment action gave rise

to an inference of unlawful discrimination.'"  *Durst v. City of Philadelphia*, 798 F. App'x 710,

713 (3d Cir. 2020) (quoting *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410–11 (3d Cir.

1999)).

A plaintiff can establish the fourth element of his *prima facie* case by offering

comparator evidence showing that similarly situated individuals who are not members of the

protected class were treated more favorably.  *Id.*  Although the Court of Appeals for the

Third Circuit has not explicitly stated what constitutes a similarly situated employee, a panel

of our Circuit Court stated that it "accept[s] the standard used by other circuits that to be

considered similarly situated, comparator employees must be similarly situated in all

relevant respects."  *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011)

(citing *Russell v. University of Toledo,* 537 F.3d 596 (6th Cir. 2008); *Lee v. Kansas City S.

Ry. Co.,* 574 F.3d 253, 259–261 (5th Cir. 2009)). The panel further stated that "[a]

determination of whether employees are similarly situated takes into account factors such

as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." 441 F. App'x at 882 (citing *Lee,* 574 F.3d at 259–61; *Burks v. Wis. Dep't of Transp.,* 464 F.3d 744 (7th Cir. 2006)). This is consistent with the recent *Durst* panel's statement that "[a]lthough 'similarly situated' does not mean identically situated, the comparator must be similar in all relevant respects." 798 F. App'x at 713 (citing *Johnson v. Kroger Co.,* 319 F.3d 858, 867 (6th Cir. 2003)). *Durst* identified relevant factors to "include whether the comparators had the same supervisor, were subject to the same standards, and had engaged in similar conduct." *Id.* In *Crawford v. Verizon Pennsylvania, Inc.,* 103 F. Supp. 3d 597, 604-06 (E.D. Pa. 2015), the district court noted that "[n]either our Court of Appeals nor other Circuits have determined how closely a plaintiff and comparator must be matched or which factor carries dispositive weight—the individuals' employment situation or the conduct that led to the adverse employment decision."

To distinguish Sandone and Fox, the supervisory comparators offered, Defendant relies primarily on the difference in the language used by Plaintiff and that used by Sandone and Fox, who were both operations supervisors, the position held by Plaintiff when he was terminated. (Doc. 41 at 12; Doc. 51 at 6.) Defendant specifically points to Plaintiff's use of the "n word" and the lack of evidence that Sandone or Fox used that word or any other racial slur in their altercations with dockworkers. (*Id.*) Defendant acknowledges that the cursing and yelling that occurred during altercations violated the company policy and breached standards of conduct (*see, e.g.,* Doc. 51 at 8), but it relies on an asserted

fundamental difference between the discriminatory language admittedly used by Plaintiff

and that used by Sandone and Fox and distinctions contained in its policy.  (Doc. 41 at 12-

13; Doc. 51 at 6-8.)

> FXF policy recognizes a difference between abusive and discriminatory
> language. FXF's Code of Conduct prohibits "profane, harassing, sexually
> explicit, discriminatory, or abusive language." Ex. A to SUMF FXF 00305. FXF
> found that Sandone's use of profanity fell under the rubric of "offensive,
> insulting, or abusive language." Ex. E to SUMF, Ex.2 FXF00378. Similarly, the
> incident involving Fox concerned "profanity" SUMF ¶ 37.3 In contrast, FXF
> found that Plaintiff's use of the "n-word" was "discriminatory language." Ex. A
> to SUMF FXF 00195. While under the same policy, these are distinct violations.

(Doc. 51 at 8-9.)

Defendant posits that "the conduct of comparators, and its relative severity, is a key

factor in determining whether employees are similarly situated."   (Doc. 51 at 7 (citing *Dove*

*v. Community Educ. Ctrs., Inc.*, Civ. A. No. 12-4384, 2013 WL 6238015, at *17  (E.D. Pa.

2013) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n.11 (1976))).)

With the distinctions between Plaintiff's conduct and that of the supervisory comparators,

Defendant concludes that Plaintiff is unable to rely on Sandone and Fox to support his

*prima facie* case.  (Doc. 51 at 10.)

The Court recognizes that Plaintiff and the supervisory comparators violated

Defendant's policy in different ways. The Court also recognizes that the use of the offensive

language in question, specifically the word "nigger," is, as the Sixth Circuit explained in

*NLRB v. Foundry Division of Alcon Indus.*, 260 F.3d 631, 635 (6th Cir. 2001), "a racial slur . .

. irrespective of its common usage and without regard for the race of those who use it [and]

[n]o employer should tolerate use of the language."   The Circuit Court noted that "it would

behoove a prudent employer . . . concerned with the climate in the workplace and

recognizing the diversity of today's workforce, to condemn all such language and counsel

employees and members against the use of any terms that denigrate and slur."  260 F.3d at

635.

　　　While the use of the offensive language at issue here should absolutely be

condemned, the Court cannot summarily conclude that the context within which the

language was used is insignificant in determining whether the use of a racial slur by a

supervisor is dispositively different than the use of profanity by a supervisor. Though

addressing the use of the word "nigger" in a different legal context, the Sixth Circuit in NLRB

did not find the use of the language *per se* actionable but, rather, considered "the context in

which the statements were made and the total conduct of the person who made the

statements" in deciding the NLRB's appeal.  260 F.3d at 635-36.  With its citation to

*Greenawalt v. Clarion Cty.*, 459 F. App'x 165, 168-69 (3d Cir. 2012), Defendant

acknowledges that consideration of the specific circumstances of the misconduct is a factor

addressed in Title VII comparator analysis.  (*See* Doc. 51 at 9-10.)  In *Greenawalt*, a panel

of the Third Circuit Court of Appeals found that although several jail guards violated the

same official policy on relationships with inmates, the *circumstances* of the plaintiff's specific

violation created a potential security risk which the others did not and was therefore not

sufficiently similar to the alleged comparators' conduct.  459 F. App'x at 168–69.  In

*McDonald v. Santa Fe*, the Supreme Court noted that

> precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas*, an allegation that other 'employees involved in acts against (the employer) of Comparable seriousness . . .' were nevertheless retained . . .' is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.  411 U.S. at 804.

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976).

This authority supports a contextual analysis of the language which violated Defendant's policy.  Particularly, the Supreme Court's identification of "comparable seriousness" as the central question in determining whether a plaintiff and comparators engaged in similar conduct indicates that words used cannot be considered in isolation--the misconduct alleged must be considered in the context in which it occurred.[3]

Here Plaintiff volunteered the information that he had used the word "nigger"—in his statement provided in connection with the altercation between Plaintiff and Gallagher, Plaintiff denied that he used a racial slur during the altercation but stated that "we have joked around in the past using words like nigger please, Black boy and white boy sunflower seeds [and] brother from another mother."  (Doc. 42 ¶ 16; Doc. 46 ¶ 16.)  In his deposition, Pulaski testified that he interpreted the language in the statement to mean that Gallagher

---

[3] In considering whether Plaintiff's conduct is of comparable seriousness to that of Sandone and Fox, Defendant presents no authority which suggests that the context in which the misconduct occurred is insignificant.

also used the "n word" at times when interacting with Plaintiff.  (Doc. 45-2 ¶ 13; Doc. 52 ¶

13.)  He also stated that it "would have mattered, absolutely" if Gallagher joked back and

used the same kind of language as Loving used.  (Doc. 45-2 ¶ 14; Doc. 52 ¶ 14.)  Because

the Court must view the facts in the light most favorable to the non-moving party and draw

all reasonable inferences in that party's favor, for purposes of this motion it can be

reasonably inferred from Plaintiff's and Pulaski's testimony that Plaintiff's admitted use of

the word "nigger" was not in the context of an altercation and he used the word in non-

argumentative circumstances where both parties used similar language.

Because Sandone and Fox allegedly used profanity toward subordinates in the

context of an altercation, because Sandone had other "corrective actions" before the 2015

altercation with Bragg-Best (Doc. 45-2 ¶ 32; Doc. 52 ¶ 32), and because Plaintiff asserts

that he used a discriminatory word or terms in non-hostile contexts and his assertions on

these points are not refuted by Defendant, the Court concludes that Plaintiff has produced

sufficient evidence to show that Plaintiff's misconduct and that of his comparators are of

comparable seriousness.

Defendant also attempts to discount Sandone as an appropriate comparator based

on "the undisputed facts" that show that different decision makers were involved in the

disciplinary matters for Plaintiff and Sandone.[4]  (Doc. 51 at 11; *see also* Doc. 41 at 16.)

---

[4] Defendant does not make any supervisory argument regarding Fox but rather asserts that
"[a]ccording to Cerda, Fox and Osman Sirleaf (African American), a dockworker, had been in an argument

Defendant asserts that at the time of discipline at issue, Sandone was subject to a different supervisor than Loving in regard to discipline.  (Doc. 41 at 16.)  Plaintiff responds that, other than a different employee relations specialist, the same individuals (Pulaski, Ulkoski, and Symons) were involved in handling disciplinary procedures after his altercation and Sandone's: Pulaski supervised both Plaintiff and Sandone; Pulaski notified higher management of both incidents; Ulkoski served as the next manager in the chain of command with knowledge of both incidents; and Symons was the assistant service center manager at the time of both incidents.  (Doc. 45 at 16-17.)

Although the identified decision-maker may not be the same in the Sandone incident, this distinction does not outweigh the similarities presented in the record.  Further, communication among involved individuals is indicated in Pulaski's testimony when he stated that he had phone calls with Cerda and Symons about the statements or incident but played no role in the decision-making.  (Pl.'s Ex. B, Pulaski Dep. 83:16-84:1.)

In sum, the roles of involved individuals are not identical nor is Plaintiff's conduct and that of his comparators.  However, with the Court's determination that the comparators satisfy the "comparable seriousness" standard set out in *McDonald*, 427 U.S. at 283 n.11, *see also Young*, 575 U.S. at 228, the Court concludes that Plaintiff has satisfied the "low bar for establishing a *prima facie* case of employment discrimination."  *Scheidemantle v.*

---

where there was cursing.  (SUMF ¶ 38). Cerda does not remember who was accused of cursing. *Id.* Neither employee was disciplined. *Id.*"  (Doc. 41 at 17.)

*Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (citation

omitted). Evidence that two non-members of the protected class who held the same position

in the same facility as Plaintiff and violated the same policy as Plaintiff is sufficient to satisfy

Plaintiff's burden of raising an inference of discrimination under the fourth prong of the *prima*

*facie* case.  As this is the only disputed element of the *prima facie* case, the Court will now

turn to Defendant's argument that Plaintiff cannot satisfy his burden at the pretext stage of

the *McDonnell Douglas* inquiry.

### 2.  Pretext for Discrimination

Defendant contends that Plaintiff cannot point to evidence in the record that FXF

made the decision to terminate him for the use of the word "nigger" as a pretext for racial

discrimination.  (Doc. 41 at 18.)  Plaintiff responds that he can demonstrate that the reason

given was pretextual.  (Doc. 45 at 18.)   The Court concludes that Defendant has not shown

it is entitled to summary judgment on this issue.

As noted above, *see supra* pp. 16-17, at the third stage of the *McDonnell Douglas*

inquiry, plaintiff has the burden of providing "evidence from which a factfinder could

reasonably infer that the employer's proffered justification is merely a pretext for

discrimination."  *Burton*, 707 F.3d at 426 (*citing Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d

Cir. 1994)). To survive summary judgment, "the plaintiff must point to some evidence ...

from which a factfinder could reasonably either (1) disbelieve the employer's articulated

legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely

than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at

764.  As explained in *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005),

> [i]n *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct.
> 2097, 147 L.Ed.2d 105 (2000), the Court held that proof of pretext does not
> have to include evidence of discrimination, but rather "[i]n appropriate
> circumstances, the trier of fact can reasonably infer from the falsity of the
> explanation that the employer is dissembling to cover up a discriminatory
> purpose." 530 U.S. at 147, 120 S.Ct. 2097.
>
> Although *Reeves* makes clear that we may not require affirmative
> evidence of discrimination in addition to proof of pretext, it does not change our
> standard for proving pretext which "places a difficult burden on the
> plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). In order to avoid
> summary judgment, *Fuentes* requires a plaintiff to put forward "such
> weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions
> in the employer's proffered legitimate reasons for its action that a reasonable
> factfinder *could* rationally find them unworthy of credence." *Id.* (internal
> quotation and citation omitted; emphasis in the original).

412 F.3d at 467.

Plaintiff first asserts that a jury could reasonably find Defendant's asserted reason for

termination weak and unworthy of credence.  (Doc. 45 at 18.)  Plaintiff points to his work

history, the lack of complaints about him using race-based language, and evidence that

Gallagher used race-based language in his interactions with Plaintiff.  (*Id.* (citations

omitted).)  He also points to Pulaski's deposition about Gallagher's language and inferences

a jury could draw from it.  (Doc. 45 at 19.)  Plaintiff further maintains that he can prove

pretext under the second element of the *Fuentes* test because circumstantial evidence

exists for a reasonable jury to conclude that a discriminatory animus actually motivated

Defendant in that the white males, Sandone and Fox, are similarly situated individuals who

received more favorable treatment and the white male Gallagher did not receive any discipline.  (Doc. 45 at 20-21.)   Plaintiff also posits that the selective enforcement of the code of conduct could lead a reasonable jury to conclude that Defendant's reliance on the code of conduct to terminate Plaintiff was a pretext for discrimination.  (Doc. 45 at 22.)

At his deposition, Pulaski testified about the context of the use of the offensive language:

> Q.  Did it matter if Mr. Gallagher was not offended by the language or conduct?
>
> A.  Absolutely not?
>
> Q.  Why not?
>
> A.  I don't think language like that should ever be used in the workplace whether you're offended or not.  You may not be offended, but it may offend me.  So I think especially that language should not be tolerated in the workplace.
>
> Q.  Did it matter if Mr. Loving was just joking?
>
> A.  No.
>
> Q.  If Mr. Gallagher joked back and used the same language, did that matter?
>
> A.  That would have mattered, absolutely.
>
> Q.  So did you find that Mr. Gallagher never used that language?
>
> A.  Not in my – not in my investigation in collecting the statements.  I didn't find that he used that.
>
> Q.  Do you know if anyone did in any other investigation?

> A.  I do believe, in Mr. Cerda's recap, it was alleged that Dave used some
> form of racial or discriminatory language.

(Pl.'s Ex. B, Pulaski Dep. 82:10-83:8 (Doc. 45-1).)  This testimony, considered in the light

most favorable to Plaintiff, supports an inference that his supervisor acknowledged the

contextual significance of the use of the word "nigger," an inference which undermines a

finding that Defendant considered the use of the word to be categorically more egregious

than a supervisor's use of profanity toward a subordinate during an altercation, i.e., the

misconduct with which Sandone and Fox were charged, such that termination rather than a

lesser form of discipline was warranted.

Further, although Gallagher is not an appropriate comparator in a "similarly situated"

analysis because of the different positions held, the level of investigation into his alleged

use of offensive language and the fact that he received no discipline are matters which may

be considered in deciding pretext.  As Plaintiff asserts, "[a] jury could determine that

terminating Plaintiff for his alleged admission of race-based language made no sense in

light of the evidence that Gallagher joked back and used similar language."  (Doc. 45 at 19.)

In light of the foregoing discussion, the Court concludes that issues of material fact

and credibility exist which preclude a finding that Plaintiff cannot establish pretext as a

matter of law.  Therefore, Defendant's motion for judgment in its favor on Plaintiff's race

discrimination claims is properly denied.

B. <u>Age Discrimination</u>

Defendant contends that Plaintiff cannot establish a cause of action for age discrimination because the record contains no evidence to suggest that it ever discriminated against Plaintiff or anyone else based on age.  (Doc. 41 at 20-21.)   Plaintiff responds that disputed issues of material fact preclude summary judgment on his age discrimination claims.  (Doc. 45 at 23.)  The Court concludes that Defendant is entitled to judgment in its favor on Plaintiff's ADEA and PHRA age discrimination claims.

ADEA and PHRA claims are analyzed under the same standard.  *See, e.g., Colwell v. Rite Aid Corp.*, 602 F.3d 495, 500 n.3 (3d Cir. 2010).  As a result, the Court generally references only the ADEA in this section of the Memorandum Opinion.

The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, terms, conditions, or privileges of employment on the basis of their age.  *See* 29 U.S.C. § 623(a)(1).  As summarized in *Palmer v. Britton Industries, Inc.*, 662 F. App'x 147 (3d Cir. 2016) (not precedential), "[t]he Federal Age Discrimination in Employment Act prohibits employers from taking adverse action against an employee who is at least 40 years old, 29 U.S.C. § 631(a), 'because of such individual's age.' 29 U.S.C. § 623(a)."  662 F. App'x at 150. The "[p]laintiff ha[s] the burden to show that his 'age was the 'but-for' cause of the employer's adverse action.'"  *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

Following *Gross*, the Court of Appeals for the Third Circuit confirmed that the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), is used when a plaintiff does not present direct evidence of discrimination. *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). Under *McDonnell Douglas*, the plaintiff bears the initial burden of showing a *prima facie* case of discrimination. 411 U.S. at 802. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to identify a legitimate non-discriminatory reason for the adverse employment action." *Smith*, 589 F.3d at 689. "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (*citing Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (*citing Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

Once the defendant offers a legitimate non-discriminatory reason, "the burden of production [shifts] back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426 (*citing Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)). To survive summary judgment, "the plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely

than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

In its supporting brief, Defendant states "[a]ssuming for the purpose of summary judgment that a factual dispute exists regarding the age of Loving's replacement, the record contains no support that the termination was a pretext for age discrimination." (Doc. 41 at 20.)  With this argument, Defendant focuses on the prextext stage of the *McDonnell Douglas* inquiry.  However, Defendant asserts in its reply brief that Plaintiff cannot make out a *prima facie* case for age discrimination because the comparators are not similarly situated for the reasons discussed regarding race discrimination and Plaintiff presents no proof that he was replaced by a younger employee, the fourth element of an ADEA *prima facie* case.[5] (Doc. 51 at 5-6, 12.)

As a threshold matter, the Court concludes that Defendant has waived an argument that Plaintiff cannot satisfy the *prima facie* case for his age discrimination claims. "Arguments raised for the first time in a reply brief are generally waived. Fairness requires that nonmovants have the opportunity to respond to any arguments presented by the movant." *Dommel Properties, LLC v. Jonestown Bank and Trust Co.*, Civil Action No. 11-cv-2316, 2013 WL 4855427, at *3 n.1 (M.D. Pa. Sept. 11, 2013).  However, where the non-

---

[5] To establish a *prima facie* case of age discrimination, the plaintiff must generally show the following: 1) he is forty years old; 2) the defendant took an adverse employment action against her; 3) the plaintiff was qualified for the position in question; and 4) the plaintiff was replaced by another employee who was sufficiently younger so as to support an inference of discriminatory animus. *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

moving party has had an opportunity to respond to an argument, the court may, in its discretion, address it.   *Avco Corp. v. Turn & Bank Holdings, Inc.*, No. 4:12-CV-1313, 2017 WL 2224915, at *3 n.16 (M.D. Pa. May 22, 2017) (oral argument afforded the party opposing the motion the opportunity to respond at length to the moving party's argument). Here, Defendant did not argue that Plaintiff could not satisfy a *prima facie* case of age discrimination in its supporting brief.  (*See* Doc. 41 at 19-21.)  Although Plaintiff discussed his *prima facie* case in his opposition brief (Doc. 45 at 23-24), he did not have an opportunity to respond to Defendant's argument that Cerda was unaware of his age at the time of his decision and there is not proof that a younger employee replaced Plaintiff.  (Doc. 51 at 12.)  In these circumstances, the Court deems Defendant's *prima facie* age discrimination argument waived.

Despite finding the *prima facie* argument waived, the Court notes that the record contains conflicting information about Plaintiff's age.  The Amended Complaint filed on June 25, 2018, states that Plaintiff "is a sixty-one-year-old, African-American male" (Doc. 18 ¶ 1), and Defendant states in its Answer that "[u]pon information and belief, FedEx admits the allegations contained in numbered paragraph 1 of the Complaint" (Doc. 19 ¶ 1).  Plaintiff's September 17, 2017, Pennsylvania Human Relations Commission Charge lists his date of birth as December 12, 1966.  (Doc. 42 ¶ 29; Doc. 46 ¶ 29.)  If correct, Plaintiff would have been fifty-one years old when he filed his Amended Complaint in June 2018.  Defendant asserts that Sandone was 51 when he was terminated in 2018, the same age as Plaintiff

was when he was terminated in June 2017.  (Doc. 41 at 21.)   Plaintiff states that Sandone

was 48 years old when he was charged with the comparator misconduct in 2015 (which is

consistent with Defendant's statement that Sandone was terminated three years later at the

age of 51), and asserts that both Sandone and Fox (who was in his late 20s or early 30s)

were "substantially younger" than he.  (Doc. 45 at 24.)   If Plaintiff in fact was born in 1966,

he and Sandone are approximately the same age and were of similar ages when they were

disciplined differently for the misconducts in question: Sandone was 48 and Plaintiff was 50.

Turning now to the pretext stage of the *McDonnell Douglas* inquiry, the Court will

consider whether Defendant has shown it is entitled to judgment as a matter of law because

Plaintiff cannot show that the proffered reason for termination was a pretext for age

discrimination.  The Court analyzes this question in the following framework.

For an ADEA claim, "the plaintiff retains the burden of persuasion to establish that

age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Financial

Services, Inc.,* 557 U.S. 167, 177 (2009).  In *Gross*, the Court concluded that, unlike a Title

VII discrimination claim which can be maintained with a showing that an improper

consideration was a motivating factor for the employer's action, the ADEA requires proof

that the prohibited criterion was the but-for cause of the prohibited conduct.  *Id.* at 174, 177.

As *Gross* explained, "the ordinary meaning of the ADEA's requirement that an employer

took adverse action 'because of' age is that age was the 'reason' that the employer decided

to act." 557 U.S. at 176 (citing *Hazen Paper Co. v. Biggins*, 507 U.D. 604, 610 (1993)

(explaining that the claim "cannot proceed unless the employee's protected trait actually played a role in [the employer's decisionmaking] process and had a determinative influence in the outcome."); *see also  Palmer v. Britton Indus., Inc.*, 662 F. App'x 147, 150 (3d Cir. 2016) (not precedential) (citing *Gross*, 557 U.S. at 176) ("It was not enough to show that his age was *a* factor motivating the decision to fire him. Instead, [the plaintiff] had to point to summary judgment evidence supporting an inference that his age had a determinative influence on the decision.").  The Court earlier described "but-for" causation to require a showing "that the causal link between injury and wrong is so close that the injury would not have occurred but for the act."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

The *Fuentes* standard set out above, applies to an ADEA case: to survive summary judgment, "the plaintiff must point to some evidence . . .  from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764.

Under the first prong, *Fuentes* requires a plaintiff to put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence."  *Fuentes,* 32 F.3d at 765.  As at the *prima facie* stage, at the pretext stage a plaintiff may offer comparator evidence, which, as discussed at length in the context

35

of Plaintiff's race discrimination claims, is evidence "that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). *Simpson*, an ADEA case, reiterated that "[t]he plaintiff has the burden of demonstrating that similarly situated persons were treated differently." *Id.*

To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that age was the determinative factor in the employment decision, a showing which can be made by putting forth evidence that "the employer has previously discriminated against [the plaintiff], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson*, 142 F.3d at 644–45 (citing *Fuentes*, 32 F.3d at 765). *Simpson* added that "[a] decision adversely affecting an older employee does not become a discriminatory decision merely because one younger employee is treated differently." 142 F.3d at 646.

Here Plaintiff again points to Sandone and Fox as appropriate comparators. (Doc. 4a5 at 24.) However, although the Court determined that the two supervisors were acceptable comparators in the race discrimination context, a different conclusion is required regarding age discrimination. As noted above, evidence suggests that Plaintiff and

Sandone are very close in age.  Plaintiff did not dispute the December 12, 1966, birth date listed in the PHRC charge.  (Doc. 42 ¶ 29; Doc. 46 ¶ 29.)   He did not dispute Defendant's assertion in its supporting brief that Sandone was 51 at the time of his termination, "approximately the same age as Plaintiff" (*see* Doc. 41 at 21).  Though he asserts in his opposition brief that both comparators "were substantially younger than Plaintiff" (Doc. 45 at 24), he presents no evidence to support the assertion as to Sandone.  Thus, Plaintiff is left with one comparator who was treated more favorably for purposes of his age discrimination claims.  As noted in *Simpson*, different treatment of "an older employee does not become a discriminatory decision merely because one younger employee is treated differently."  142 F.3d at 646.

Plaintiff specifically acknowledges the higher "but-for" causation necessary to show discrimination in an ADEA case and maintains that the same arguments presented in support of finding that the reason asserted for termination was pretext for race discrimination apply with equal force to the age discrimination claim.  (Doc. 45 at 24-25.) However, the force of Plaintiff's arguments in the race discrimination context are significantly diminished in the age discrimination context given the existence of only one comparator in the age discrimination context and the higher burden of showing pretext.  On this record and scant argument, the Court cannot conclude that Plaintiff has come forward with sufficient evidence for a reasonable jury to conclude that age was the but-for reason for

his termination. Therefore, Defendant is entitled to summary judgment on Plaintiff's age

discrimination claims.

## C. Retaliation

Defendant asserts that it is entitled to summary judgment on Plaintiff's retaliation

claim because the claim is procedurally and substantively flawed.  (Doc. 41 at 21-24.)

Procedurally, Defendant maintains that the retaliation claim fails because Plaintiff did not

exhaust his administrative remedies as to that claim:

> Pursuant to both the PHRA and Title VII, a complainant must bring a charge to the corresponding federal or state agency, and allow the administrative process to unfold before bringing suit. *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 470, 471 (3d Cir. 2001). Any future suit is limited to those allegations that "can reasonably be expected to grow out of the charge of discrimination," Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976).

> An allegation of retaliation "cannot be expected to grow out of" Plaintiff's Charge (*Id.*) In his Charge before the Pennsylvania Human Relations Commission ("PHRC"), Loving states that he believes he was discriminated against based on his race and age. (SUMF ¶ 29). In the section of the Charge that allowed Vaughn to check the boxes corresponding to his allegations of discrimination, Loving checked age and race, but failed to check retaliation. In his particulars, Loving never alleges that he took part in any protected activity, much less suffered retaliation for his participation in protected activity. Nothing in the Charge would lead the PHRC to investigate and make a determination as to retaliation. Accordingly, his retaliation charge must be dismissed.

(Doc. 41 at 21-22.)

Defendant also maintains that Plaintiff's retaliation claim fails on the merits because

he did not take part in a protected activity and the reasons for termination are not pretextual.

(*Id.* at 23-24.)

Plaintiff did not provide any response to Defendant's arguments.  (*See* Doc. 45.)

Therefore, Plaintiff has not satisfied his burden of showing he is entitled to relief on this

claim and summary judgment for Defendant is properly granted.

D.  Back Pay

Finally, Defendant maintains that, should any of Plaintiff's claims survive summary

judgment, his back pay should be limited to the time he was physically able to work and

should be disallowed for the periods of time when he was physically unable to work.  (Doc.

41 at 24.)  Plaintiff contends that he is entitled to a full award of back pay because there are

issues of fact as to whether he may have been able to work through his injuries if Defendant

had not terminated him or he may have been able to perform his duties with a short-term

accommodation or short-term disability leave.  (Doc. 45 at 26.)

At this stage of the proceedings, where the Court has determined that Plaintiff has a

triable claim for race discrimination, issues related to remedy are properly determined at trial

and post-trial as necessary.  This includes back pay to be awarded together with any

deduction therefrom as the evidence and law may warrant.[6]

---

[6] "Back pay is not an automatic or mandatory remedy, but 'one which the courts "may" invoke' at their equitable discretion."  *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 84 (3d Cir. 2009) (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415 (1975)).

## V.  CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. 40) will be granted in part and denied in part.  The motion will be granted as to Plaintiff's claims for age discrimination and retaliation.  The motion will be denied as to Plaintiff's claims for race discrimination and in all other respects.  A separate Order is filed simultaneously with this Memorandum Opinion.


___*s/ Robert D. Mariani*_____
Robert D. Mariani
United States District Judge